# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-390V

|  |  |
|---|---|
| ROGER CONLEY,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: July 24, 2024 |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Dorian Hurley*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On January 8, 2021, Roger Conley filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 18, 2019. Pet. at 1; Am. Pet. at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below I find that Petitioner is entitled to compensation, and I award **$125,000.00**, for past pain and suffering.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Relevant Procedural History

Approximately five months after initiating the instant claim, Petitioner filed an amended petition (including more detailed allegations), medical records, and an affidavit, followed by a statement of completion. ECF Nos. 6-7, 9. From May 2021 to January 2022, Petitioner supplemented the record with additional medical records, a vaccine administration record, and an amended statement of completion. ECF Nos. 10-12, 14-21. This case was then activated and assigned to SPU in February 2022. ECF No. 22.

In June 2022, while this case awaited medical review, Petitioner submitted a settlement demand to Respondent and submitted an additional medical record. ECF Nos. 25, 27. Following Respondent's medical review, the parties attempted to informally resolve this matter but were unsuccessful. ECF Nos. 32-35, 37. Petitioner thereafter submitted additional medical records, followed by a motion for a ruling on the record regarding entitlement and damages on July 15, 2023. Petitioner's Motion for Ruling on Entitlement and Damages ("Mot."), ECF No. 40; ECF Nos. 38-39. Petitioner argued that he meets the Table definition of a SIRVA and requested an award of $145,000.00 for actual pain and suffering. Mot. at 1-4.

Respondent reacted to Petitioner's entitlement and damages contentions on August 18, 2023. Respondent's Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Opp."), ECF No. 41. Respondent argued that Petitioner has failed to establish that the onset of his injury occurred within 48 hours of the subject flu vaccination, and thus his Table claim must fail. *Id.* at 6. Specifically, Petitioner's first report of left shoulder pain occurred thirty-three days post vaccination, and the medical records vaguely note pain "'since'" his flu shot. *Id.* at 6-7 (citing Ex. 3 at 51; Ex. 1 at 80). Otherwise, if Petitioner is found entitled to damages, Respondent argues that an award of $92,500.00 is appropriate for past pain and suffering. *Id.* at 8.

Petitioner filed a reply on September 5, 2023, wherein he maintained his previous argument that Petitioner can establish a SIRVA Table claim and addressing Respondent's arguments regarding damages. Petitioner's Reply to Respondent's Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Reply"), ECF No. 42. This matter is now ripe for resolution.

## II. Petitioner's Medical History

Petitioner's medical history was non-contributory. At age fifty-five, Petitioner received the subject flu vaccine on October 18, 2019, in his left shoulder. Ex. 11 at 3.

Thirty-three days post vaccination, on November 20, 2019, Petitioner saw a physical medicine specialist, stating that "[h]e recently had a flu shot done[,]" and "has some continued soreness in the left arm," for which he had sought urgent care. Ex. 3 at 51.[3] His physical examination revealed tenderness over the left deltoid and increased pain with supraspinatus testing; Petitioner was diagnosed with left supraspinatus tendonitis. *Id.* at 51-52. Petitioner was given home exercises to address his left shoulder pain. *Id.* at 52.

On November 22, 2019, Petitioner went to his primary care provider ("PCP") complaining of "left arm pain . . . since getting the flu vaccine." Ex. 1 at 67, 75. The note also states that Petitioner went to the emergency room ("ER") on November 17, 2019.[4] *See id.* The PCP wrote that Petitioner's left shoulder pain "started 1 to 4 weeks ago" and is described as "aching . . . moderate . . . [and] aggravated by contact." *Id.* at 75. Petitioner reported trying to alleviate his pain with NSAIDs and cold and rest, which provided "mild relief." *Id.* Upon examination, Petitioner exhibited decreased range of motion ("ROM"), tenderness, and decreased strength. *Id.* at 78. He was assessed with left arm pain and impingement syndrome; Petitioner was instructed to get an x-ray. *Id.* at 78-79. Petitioner's December 11, 2019 x-ray was normal. *Id.* at 178.

Petitioner called his PCP's office on January 9, 2020, reporting continuing left shoulder pain "from the flu shot incident." Ex. 5 at 457. The PCP recommended ibuprofen and Flexeril to treat his symptoms. *Id.* Later that month, on January 30, 2020, Petitioner returned to the physical medicine specialist complaining of ongoing difficulty with his left shoulder and that "[h]e had the flu shot in that area." Ex. 3 at 66. A physical examination revealed tenderness of the left deltoid and increased pain with "resisted supraspinatus and infraspinatus testing." *Id.* Petitioner received a cortisone injection in the left shoulder, was given a home exercise program ("HEP"), and was told to use Voltaren gel. *Id.* at 67.

Petitioner had a follow-up visit with his physical medicine specialist on March 26, 2020. Ex. 3 at 87. Petitioner stated that he was "still having difficulty with pain . . . where he got a flu shot." *Id.* He also noted that he was not performing his HEP as often as instructed. *Id.* The physician wrote that Petitioner had been taking Flexeril and oxycodone for his left shoulder pain and unrelated, chronic issues. *Id.* Voltaren gel was again recommended to treat his left shoulder symptoms. *Id.*

---

[3] No urgent care records have been filed. I am therefore unable to rely on any possible earlier visit for establishing the onset of Petitioner's left shoulder pain.

[4] While this medical record does state that Petitioner "went to [the ER] on 11/17/19," (Ex. 1 at 67), and Petitioner makes the same assertion in his affidavit, (Ex. 2 ¶ 11), no visit notes, physical examinations or findings are present in the record from Petitioner's ER visit on November 17, 2019. I am therefore unable to rely on any November 17, 2019 visit or corresponding entries in making a determination as to onset.

Following Petitioner's March 2020 visit, Petitioner did not again seek care for his left shoulder until August 4, 2020.[5] Ex. 5 at 600. The visit notes appear to contain a repeat notation that Petitioner "c/o left arm pain . . . since getting the flu vaccine." *Id.* The visit notes also state "[i]ncident location: after flu shot in December" and that the "incident occurred more than 1 week ago." *Id.* Petitioner described his pain as "aching and shooting" and that his home-remedies had been ineffective at relieving his pain. *Id.* A physical examination revealed "decreased [ROM], tenderness, pain and decreased strength." *Id.* at 604. Petitioner was diagnosed with impingement syndrome of the left shoulder, was prescribed a Medrol dosepak, and instructed to undergo an MRI and begin physical therapy ("PT"). *Id.* at 605.

On August 13, 2020, Petitioner went to an orthopedist complaining of left shoulder pain with a "[d]uration: 11 months" (or since September 2019 – prior to the subject flu vaccination). Ex. 7 at 9. Petitioner also reported that his "pain started after he received a flu shot last October." *Id.* at 10. He described his pain as constant, aching, and worse at night; Petitioner's pain also extended into his neck. *Id.* He rated the pain at a 10/10. *Id.* Upon examination, Petitioner showed full ROM with pain above ninety degrees and intact rotator cuff strength with pain. *Id.* at 13. Petitioner was assessed with impingement syndrome and radiculopathy of the cervical spine. *Id.* at 14. The orthopedist opined that Petitioner's pain "is likely coming from his neck" but Petitioner maintained the pain was from his shoulder. *Id.* Petitioner received a steroid injection, was prescribed anti-inflammatories, and was told to modify his activities and engage in exercises at home. *Id.*

Later that month, on August 27, 2020, Petitioner followed up with his orthopedist and noted a "decrease[]" in his left shoulder symptoms (rated at a 6/10), which he attributed to his receipt of the previous steroid injection and Medrol dosepak. Ex. 7 at 31. Despite this improvement, Petitioner noted that he was currently experiencing increased pain as a result of carrying ten heavy boxes the day before. *Id.* He also reported pain with overhead lifting. *Id.* An examination revealed active ROM to 150 degrees with pain and positive impingement signs. *Id.* at 32. The impression remained impingement syndrome "with glenohumeral arthritis/degenerative labral tear." *Id.* As requested, Petitioner received another steroid injection. *Id.*

---

[5] During this gap in left shoulder treatment, Petitioner attended other visits with his PCP and physical medicine specialist. He did not complain of shoulder-related complaints during these visits. *See* Ex. 1 at 17 (an April 21, 2020 PCP visit); Ex. 3 at 105 (a May 26, 2020 physical medicine visit for low back pain); Ex. 5 at 549 (a June 23, 2020 visit for a "bump on his left shoulder," without mentioning additional symptoms such as pain or decreased ROM, consistent with a SIRVA).

4

Petitioner's next effort at care occurred more than six months later, on March 15, 2021.[6] Ex. 7 at 45. On that date, he followed up with his orthopedist complaining of increased left shoulder pain "with carrying and overhead lifting." *Id.* Petitioner described his pain as "aching" and rated it at an 8/10. *Id.* He endorsed "good relief" with the Medrol dosepak and steroid injection; he inquired about receiving another injection and undergoing surgery. *Id.* Upon examination, Petitioner exhibited mildly decreased ROM with "achy pain," positive impingement signs, and "tenderness over the bicipital groove" and posterior/lateral shoulder. *Id.* at 46. The orthopedist noted that an x-ray showed acromioclavicular ("AC") joint arthritis and mild glenohumeral arthritis, and that a prior MRI showed "multiple loose bodies with 360-degree degenerative labral tear and partial biceps tendon tearing." *Id.* Petitioner was assessed with left shoulder impingement syndrome, a "loose body in [the left] shoulder joint," and a partial degenerative rupture of the left biceps tendon. *Id.* Petitioner received a repeat steroid injection and was told to use ice, anti-inflammatories, and to modify his activities. *Id.* He was also told that he "need[ed] to wait 3 months until he can have his surgery." *Id.*

On May 3, 2021, Petitioner went back to his orthopedist, reporting "no change" in his left shoulder symptoms, including that he did not experience "any relief" from his previous steroid injection. Ex. 12 at 19. Despite this description, he rated his pain at a 3/10. *Id.* Petitioner again expressed an interest in surgery. *Id.* A physical examination was unchanged. *Id.* at 20. In light of Petitioner's ongoing symptomology despite conservative treatment, the orthopedist recommended arthroscopic surgery, and Petitioner agreed. *Id.* at 21. Petitioner underwent arthroscopic labral debridement, removal of loose bodies, and an open subpectoral biceps tenodesis on May 20, 2021. Ex. 17 at 28.

Petitioner had a post-operative follow-up with his orthopedist on June 2, 2021. Ex. 12 at 37. Petitioner reported that his pain was "steadily decreasing" and his left shoulder was "doing well." *Id.* He also had "[g]ood passive motion to 110 degrees." *Id.* The orthopedist noted that Petitioner would soon be starting PT. *Id.* It does not appear that Petitioner underwent PT treatment.

On August 20, 2021, Petitioner returned to his orthopedist for another follow-up, during which he noted that his left shoulder pain was "improving" (rated at a 0/10). Ex. 12 at 45. The orthopedist noted that Petitioner was experiencing "no symptoms" and that his "preoperative symptoms [were] gone." *Id.* at 46. A physical examination revealed no tenderness, "good" strength, and "essentially full active and passive" ROM. *Id.* at 45-46.

---

[6] During the gap between Petitioner's August 27, 2020 visit and his March 15, 2021 visit, Petitioner attended two visits with his PCP, during which he did not mention left shoulder complaints. Ex. 5 at 637 (a September 23, 2020 PCP visit wherein he "want[ed a] flu vaccine"); Ex. 5 at 695-701 (a December 22, 2020 PCP visit for chronic issues with no shoulder-related complaints).

The orthopedist and Petitioner discussed "long-term arthritis issues" and Petitioner was instructed to continue home stretching and strengthening exercises and to use ice and anti-inflammatories as needed. *Id.* at 46.

Approximately ten months later, on June 15, 2022, Petitioner had an orthopedic follow-up, and he now reported that "his shoulder is day to day, but [he] had an overall increase in pain over the past 4 months." Ex. 18 at 7. A physical examination showed active motion to 120 degrees with assistance, to 165 degrees with "achy pain," good strength, and "mild crepitus on motion." *Id.* Petitioner received a repeat steroid injection and was advised to treat his shoulder with ice, "light" and "gentle" stretching and strengthening exercises, to engage in modified activities, take anti-inflammatories, and to follow up if his symptoms persisted. *Id.* No additional medical records have been filed.

### III.  Affidavit Evidence

Petitioner attests that his left shoulder pain began "[a]fter receiving the flu shot" and "peaked the day after the vaccination." Ex. 2 ¶ 9. He states that "[b]y that time, [he] was experiencing a disruptive pain, soreness, and discomfort" in his shoulder. *Id.* Petitioner describes an inability to sleep on his left side and that he could not move his arm in "all directions" without experiencing pain. *Id.* Petitioner "hoped that it would eventually get better, but the pain continued to get worse." *Id.*

He next states that "[o]ne week after" the subject vaccination, "the pain was so intense" that he sought medical care by calling his PCP; Petitioner's PCP told him to go to the ER if his pain persisted to that degree. Ex. 2 ¶ 10. Petitioner contends that he presented to the ER on November 17, 2019,[7] and he was told the pain would run a "'natural course.'" *Id.* ¶ 11. When his pain did not improve, he sought additional care. *Id.* ¶¶ 12-13. Petitioner then describes his course of treatment consistent with his petition. *See, generally* Ex. 2.

At the time his supplemental affidavit was drafted, in July 2023, Petitioner was still experiencing pain and limitations in ROM as a result of his flu shot. Ex. 19 ¶¶ 5, 9-10. He had "a few months" of "significant" relief following his May 2021 surgery, but then his pain and limited ROM returned "at the beginning of 2022." *Id.* ¶ 6. Petitioner's difficulties with "lifting things, dressing [], or showering . . . lift[ing] objects over 10 pounds," and sleeping presently continue. *Id.* ¶ 10.

Petitioner addresses his lack of PT treatment and states that when he returned to his orthopedist in May 2021 and PT was recommended, he "was planning to go" but

---

[7] *See supra*, note 4.

personal circumstances precluded him from doing so. Ex. 19 ¶ 7. Specifically, his father had recently passed away and his mother was in a rehabilitation facility, requiring him to watch her house for four months (two hours away from his hometown). *Id.* Because of these circumstances, Petitioner was given at-home exercises to perform rather than present in-person for such treatment. *Id.*

## IV.   Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[8] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

---

[8] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

  (ii) Pain occurs within the specified time frame;

  (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

  (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

  A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

  Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

  Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

  A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though

the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1. Petitioner Has No Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise.

#### 2. Onset of Petitioner's Injury Occurred within 48 Hours of his Vaccination

The aforementioned medical records, coupled with Petitioner's affidavit, establish that Petitioner consistently reported to treaters onset close-in-time to vaccination, that he sought treatment within roughly one month of his October 18, 2019 vaccination, and that he indeed was experiencing symptoms in the relevant timeframe. *See,* e.g., Ex. 1 at 67, 75; Ex. 7 at 10; Ex. 2.

Respondent argues Petitioner cannot establish onset, in part because his closest medical record came thirty-three days post vaccination, on November 20, 2019. Opp. at 6. More so, even though Petitioner described his pain during that visit as being present "since getting the flu vaccine," Petitioner's symptoms are "vaguely" documented as

occurring after or "since" his flu shot in the medical records. *Id.* at 7 (citing Ex. 3 at 51; Ex. 1 at 80).

These objections are ultimately unpersuasive, however, when considered against the totality of the evidence. First, the records show that Petitioner sought treatment in a relatively timely manner (i.e., barely more than a month after vaccination). It is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Here, however, the delay was not appreciably long – and the fact that treatment was sought in a relatively short timeframe is supportive of a close-in-time onset.

Second, Petitioner affirmatively and repeatedly linked his shoulder pain to the flu vaccine – beginning with the November 20th treatment encounter, at which time he noted "[h]e recently had a flu shot done[,]" and "has some continued soreness in the left arm." Ex. 3 at 51. This reporting provides additional support for a close-in-time onset. Other subsequent medical records also corroborate the contention made in Petitioner's affidavit that Petitioner's pain began within 48 hours of vaccination. *See,* e.g., Ex. 1 at 75 (a November 22, 2019 note complaining of left shoulder pain "since getting the flu vaccine"); Ex. 5 at 457 (a January 9, 2020 note reflecting continuing left shoulder pain "from the flu shot incident."); Ex. 3 at 66 (a January 30, 2020 note reporting left shoulder pain and that "[h]e had the flu shot in that area."); Ex. 3 at 87 (a March 26, 2020 note stating he was "still having difficulty with pain . . . where he got a flu shot."); Ex. 7 at 10 (an August 13, 2020 note showing Petitioner's "pain started after he received a flu shot last October."). Some of these medical entries do not contain a precise date of onset, instead including only a general temporal relationship between onset of his injury and his subject flu vaccination. Yet, Petitioner consistently linked the two events.

Admittedly, some of Petitioner's medical records contain entries placing onset outside the 48-hour window required by the Table (e.g., Ex. 5 at 600 – an August 4, 2020 note placing onset after a "flu shot in December[;]" Ex. 7 at 9 – an August 13, 2020 note stating the duration of pain for "11 months" or since September 2019 (pre-vaccination)). But Petitioner sufficiently (and close in time to the injury) reported a short onset to find in Petitioner's favor on this issue. At worst, the overall evidence creates a "tie" that should be decided for Petitioner. *Roberts v. Sec'y of Health & Hum. Servs.*, No. 09-427V, 2013 WL 5314698, at *10 (Fed. Cl. Spec. Mstr. Aug. 29, 2013) (noting petitioners are afforded the benefit of close calls in the Vaccine Program).

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's left shoulder pain more likely than not occurred within 48 hours of vaccination, and thus within the Table timeframe.

### 3. Petitioner's Pain was Limited to her Left Shoulder

The third requirement for a Table SIRVA is that the pain and limited ROM are limited to the shoulder in which the subject vaccination was administered. 42 C.F.R. § 100.3(c)(10)(iii). Respondent has not contested that Petitioner meets this criterion, and there is not preponderant evidence in the filed record to suggest otherwise.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not contend that Petitioner fails to meet this criterion, and there is not preponderant evidence in the filed record to suggest otherwise.

## B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on October 18, 2019, in Bethel, Ohio. Ex. 11 at 3; Ex. 5 at 393; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Ex. 2 ¶ 8; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, it is not disputed that Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V.     Damages

The parties have also briefed damages in this case, which is limited to a request for a past pain and suffering award. Petitioner requests $145,000.00 for actual pain and suffering. Mot. at 1; Reply at 6. Respondent proposes an award of $92,500.00 for past pain and suffering. Opp. at 8.

### A.  Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion from Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs*., No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[9]

### B.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, affidavits, plus all filings submitted by both

---

[9] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing seven prior damages determinations (*Meyers, Reynolds, Stromer, Collado, Peterson, Majerus,* and *Monson*),[10] Petitioner requests an award of $145,000.00 for actual pain and suffering. Mot. at 1, 30-33; Reply at 6, 9-10. He asserts that the severity of his injury is comparable to the awards from the aforementioned SIRVA cases. Mot. at 33-34; Reply at 15-17. In particular, Petitioner emphasizes that he has "suffered since the onset of his shoulder injury on October 18, 2019[;]" he sought treatment "less than a month" after his vaccination (when he reported to the ER); he treated with visits to his PCP and an orthopedic surgeon, underwent x-rays and an MRI, had five cortisone injections, one arthroscopic surgery, and completed at-home PT exercises. Mot. at 33-34; Reply at 15-17. He notes that "almost four years after the onset of his SIRVA," he continues to experience difficulties with using his left arm to lift, reach for, and raise objects – despite his extensive treatment. Reply at 15 (citing Ex. 2; Ex. 19). He argues he "will likely continue to suffer [these residual limitations] into the indefinite future." *Id.* at 16.

Respondent, by contrast, maintains that an award of no more than $92,500.00 is appropriate. Opp. at 8. Although Petitioner required prescription medication, received five steroid injections, and had arthroscopic surgery; he did not undergo PT. *Id.* In addition, Petitioner had "several significant gaps in treatment," and visits wherein he did not mention ongoing shoulder pain – thus entitling Petitioner to a lesser award. *Id.* Respondent further asserts that Petitioner did not seek treatment after June 15, 2022. *Id.* He thus compares the facts of Petitioner's case to *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021), arguing that the treatment gaps there are consistent.

The filed record in this case establishes that Petitioner suffered a serious SIRVA overall, with fairly significant pain upon onset. Particularly relevant to my decision includes

---

[10] *Meyers v. Sec'y of Health & Hum. Servs.*, No. 18-909V, 2020 WL 3755335 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $122,500.00 for actual pain and suffering); *Reynolds v. Sec'y of Health & Hum. Servs.*, No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021) (awarding $125,000.00 for actual pain and suffering); *Stromer v. Sec'y of Health & Hum. Servs.*, No. 19-1969V, 2022 WL 1562110 (Fed. Cl. Spec. Mstr. Apr. 8, 2022) (awarding $145,000.00 for actual pain and suffering); *Collado v. Sec'y of Health & Hum. Servs.,* No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for actual pain and suffering); *Peterson v. Sec'y of Health & Hum. Servs.,* No. 20-1649V, 2023 WL 3591166 (Fed. Cl. Spec. Mstr. Apr. 20, 2023) (awarding $130,000.00 for actual pain and suffering); *Majerus v. Sec'y of Health & Hum. Servs.,* No. 20-1346V, 2023 WL 4573215 (Fed. Cl. Spec. Mstr. June 16, 2023) (awarding $135,000.00 for actual pain and suffering); *Monson v. Sec'y of Health & Hum. Servs.,* No. 20-1350V, 2023 WL 2524059 (Fed. Cl. Spec. Mstr. Mar. 15, 2023) (awarding $155,000.00 for actual pain and suffering).

the evidence demonstrating Petitioner's treatment with his PCP within thirty-three days of his vaccination,[11] subsequent treatment with prescriptions for a Medrol dosepak, Flexeril, and oxycodone,[12] x-rays, an MRI (showing "multiple loose bodies with 360 degree degenerative labral tear and partial biceps tendon tearing"), five corticosteroid injections, one surgery (which Petitioner underwent over 19 months post onset), and participation in at-home PT exercises – resulting in some residual effects. Additionally, while Petitioner's medical records do not contain descriptions of his pain on a ten-point scale at his first post-vaccination visits, in later records containing such descriptions he rated his pain at a 10/10, subsequently decreasing to a 6/10 with his receipt of a steroid injection, then – following a break in treatment – increased pain at an 8/10, with a decline to a 3/10 then 0/10 by August 2021. *See,* e.g., Ex. 7 at 10 (an August 13, 2020 note reporting pain at a 10/10); Ex. 7 at 31 (an August 27, 2020 note reporting pain at a 6/10); Ex. 7 at 45 (a March 15, 2021 note reporting pain at an 8/10); Ex. 12 at 9 (a May 3, 2021 note reporting pain at a 3/10); Ex. 12 at 45 (an August 20, 2021 note reporting pain at a 0/10). Such notations support a severe SIRVA upon onset, with significant improvement at the conclusion of his aggressive treatment, including one surgery.

Additionally, Petitioner suffered from reduced ROM that was initially reported soon after his vaccination. His reduced ROM was documented on examination at Petitioner's first post-vaccination visit and consistently thereafter.[13] *See,* e.g., Ex. 1 at 78 (a November 22, 2019 examination revealing decreased ROM); Ex. 5 at 604 (an August 4, 2020 examination showing decreased ROM); Ex. 7 at 32 (an August 27, 2020 examination wherein Petitioner exhibited limited ROM); Ex. 7 at 46 (a March 15, 2021 examination showing limited ROM); Ex. 18 at 7 (a June 15, 2022 examination revealing active motion to 120 degrees with assistance and to 165 degrees with "achy pain," and "mild crepitus on motion."). *Id.* The medical records thus show that Petitioner's limitations in ROM continued *to an extent.* Indeed, although Petitioner's August 20, 2021 records document "essentially full active and passive" ROM following his surgery (Ex. 12 at 45-46), his June 2022 records serve as evidence in the medical records that his restricted ROM was ongoing. While said records do not fully support Petitioner's assertion made in his July

---

[11] *See supra*, note 4.

[12] Although Petitioner was initially prescribed Flexeril for his left shoulder symptoms, the medical records also show that he was taking Flexeril and oxycodone for both his left shoulder pain *and* unrelated, chronic issues. *Compare* Ex. 5 at 457 (prescribing Flexeril for Petitioner's left shoulder pain), *with* Ex. 3 at 87 (noting Petitioner had been taking Flexeril and oxycodone for his left shoulder and chronic issues). As such, I cannot award Petitioner's receipt of such prescription medications *much* weight in determining the degree of Petitioner's pain and suffering, however, they are still relevant.

[13] Petitioner's medical records do contain one examination (on August 23, 2020), during which Petitioner exhibited full ROM with pain. Ex. 7 at 13. However, the notes from Petitioner's other medical visits around this time document restricted ROM upon examination and thus provide support for limited ROM.

2023 affidavit that his ROM has not fully recovered by that time, there is evidence (albeit slight) that his limitations in ROM continued through *at least* June 2022.

Further, the record preponderantly establishes that Petitioner's treatment course and ongoing symptoms continued for approximately two years and eight months. Although Petitioner alleges a four-year course, there are no contemporaneous treatment records after June 15, 2022 (31 months and 28 days post vaccination). While I credit Petitioner's assertions in his affidavit that he has continued to experience *residual* symptoms of his SIRVA, including pain and limited ROM, his overall recovery has been fairly good overall – a fact supported by his lack of continued formal treatment contained in the medical records. Indeed, Petitioner's assertions in his affidavit underscore that his lingering symptoms, although present, were manageable with conservative treatment without requiring his return to further formal treatment. In fact, merely two months following his surgery, in August 2021, Petitioner reported (and his medical records corroborate) that he experienced improvement (e.g., rating his pain at a 0/10). Ex. 12 at 45; Ex. 19. It was only ten months later, in June 2022, that Petitioner briefly returned to care citing a flare-up in his shoulder symptoms – not requiring subsequent care.

The severity and duration of Petitioner's pain, although significant (at times) and fairly lengthy, is offset by two long treatment gaps that somewhat undermine assertions about this SIRVA's severity. *See Shelton,* 2021 WL 2550093, at *7. But when medical records filed for petitioners in the Program reveal comparable gaps, I weigh the reason for the gaps against evidence of a petitioner's purported pain. The record reveals that the timing and explanation for Petitioner's first gap in treatment (from August 2020 to March 2021) can be (at least partially) explained by Petitioner's receipt of a steroid injection on August 13, 2020. Ex. 7 at 10. Additionally, his second gap in treatment approximately one year later (from August 2021 to June 2022) can be explained by the relief he admittedly experienced from his May 2021 debridement surgery. *See,* e.g., Ex. 12 at 46; Ex. 19 ¶ 6. Otherwise, I typically deem the decision to forego treatment as evidence that heavily underscores the mildness or stability of the injury, since it could be endured without medical assistance for periods of time.

The overall severity and duration of the injury at issue herein is ultimately distinguishable from *Shelton*. That petitioner waited *five months* before seeking initial care, and then waited another three months before returning for continued, consistent treatment. 2021 WL 2550093, at *7. Even though the *Shelton* petitioner subsequently underwent surgery, the award was reduced due to *Shelton's* initial delay in seeking treatment plus the additional gap before returning to care. *Id.* Petitioner here, by contrast, sought treatment within roughly *one month* of vaccination, and then was mostly consistent

in his efforts to treat the SIRVA, and is thus entitled to a higher award than what was awarded in *Shelton*.

The cases relied upon by Petitioner are more instructive – but the severity of Petitioner's injury does not quite warrant the $145,000.00 sum requested by Petitioner. For instance, as here, the petitioners in *Stromer, Peterson, Majerus,* and *Monson* experienced moderate and severe pain levels, treated for well over two years,[14] and underwent surgery. *See Stromer v. Sec'y of Health & Hum. Servs.*, No. 19-1969V, 2022 WL 1562110 (Fed. Cl. Spec. Mstr. Apr. 8, 2022); *Peterson v. Sec'y of Health & Hum. Servs.,* No. 20-1649V, 2023 WL 3591166 (Fed. Cl. Spec. Mstr. Apr. 20, 2023); *Majerus v. Sec'y of Health & Hum. Servs.,* No. 20-1346V, 2023 WL 4573215 (Fed. Cl. Spec. Mstr. June 16, 2023); *Monson v. Sec'y of Health & Hum. Servs.,* No. 20-1350V, 2023 WL 2524059 (Fed. Cl. Spec. Mstr. Mar. 15, 2023). But those petitioners also received objectively more treatment than Petitioner, including *many* PT sessions[15] – a treatment which, although recommended, Petitioner did not receive.[16]

*Stromer* is further distinguishable, since that petitioner experienced a 22.5% permanent deficit in shoulder function following aggressive treatment, whereas Petitioner here experienced merely residual effects of his injury. *Stromer*, 2022 WL 1562110, at *10. Although Petitioner has experienced pain and residual effects of his SIRVA for longer than the *Stromer* and *Majerus* petitioners, his treatment course (void of formal PT) speaks to a lesser award. *Id.*; *Majerus*, 2023 WL 4573215.

Indeed, the severity of Petitioner's injury is more akin to *other* cases he relied upon, where $120,000.00 and $122,500.00 for past pain and suffering was awarded, respectively. *See Collado v. Sec'y of Health & Hum. Servs.,* No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018); *see also Meyers v. Sec'y of Health & Hum. Servs.*, No. 18-909V, 2020 WL 3755335 (Fed. Cl. Spec. Mstr. June 5, 2020). The *Collado* petitioner presented within two weeks of the subject vaccination, treated with one steroid injection, six PT sessions, underwent a surgery, and experienced a seven-month course overall. 2018 WL 3433352. The *Meyers* petitioner sought initial care within approximately one month after the subject vaccination, received two steroid injections, underwent four PT sessions and a surgery, and treated for a total of eight months. 2020 WL 3755335.

---

[14] With exception, the petitioner in *Stromer* treated for a total of 15 months. *Stromer*, 2022 WL 1562110.

[15] The *Stromer* petitioner participated in a total of 60 PT sessions. *Stromer*, 2022 WL 1562110. The *Peterson* petitioner participated in 66 PT sessions, consisting of three separate rounds. *Peterson*, 2023 WL 3591166. The *Majerus* petitioner participated in 31 PT sessions. *Majerus*, 2023 WL 4573215. The *Monson* petitioner participated in 42 PT sessions, consisting of two separate rounds. *Monson*, 2023 WL 2524059.

[16] Petitioner did complete at-home PT exercises for an unspecified period of time; however, he did not attend formal PT treatment.

Thereafter, however, the *Meyers* petitioner experienced ongoing pain at a 5/10 – whereas Petitioner rated his pain at a 0/10 within two months of his surgery and only experienced an exacerbation of his pain ten months later (without a return to formal care thereafter). Still, given the *significantly* longer duration of Petitioner's injury compared to *Collado* and *Meyers* (even considering Petitioner's lengthy gaps in treatment), I find a higher award is just. I will thus award *slightly* more than the petitioner in *Meyers*, due to Petitioner's documented significant pain level (8/10) more than one year post vaccination on March 15, 2021, his receipt of five cortisone injections, arthroscopic debridement and corresponding procedures, and his documented residual pain and ROM restrictions more than thirty-two months post onset.

Overall, the best comparable offered in this case involved a $125,000.00 past pain and suffering award. *Reynolds v. Sec'y of Health & Hum. Servs.*, No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021). The *Reynolds* petitioner presented within two weeks of the subject vaccination, was treated with oral steroids, two cortisone injections, two rounds of PT (totaling 12 sessions), underwent a surgery, and treated for a duration of 24 months. *Reynolds*, 2021 WL 3913938. While Petitioner did not undergo treatment with PT, he did receive three additional steroid injections and treated for a longer duration. But the treatment course was otherwise comparable – and therefore the same sum is properly awarded.

## Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of his vaccine, and he has otherwise satisfied the requirements for a Table SIRVA claim. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$125,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[17]

---

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[18]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.